# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MAUREEN EICHMAN, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>   v.<br><br>UMB BANK, N.A.<br><br>         Defendant. | Cause No.<br><br><br>**JURY DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff Maureen Eichman, by counsel, brings this Class Action Complaint against Defendant UMB Bank, N.A. ("UMB" or "Defendant"), and alleges as follows:

### NATURE OF THE ACTION

1.     This is a civil action seeking monetary damages, restitution, injunctive, and declaratory relief from UMB over the improper assessment and collection of $36 "Overdraft Charge(s)" ("OD Fees") on debit card transactions that were authorized on sufficient funds and that settled on negative funds in the same amount for which the debit card transaction was authorized before the authorization hold expired.

2.     Besides being deceptive, this practice breaches UMB's standardized adhesion contract, which consists of the Important Information Regarding Your Deposit Accounts document (the "Account Agreement") attached hereto as <u>Exhibit A.</u> This practice also violates the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.010 *et seq.*

3.     Plaintiff and UMB customers have been injured by UMB's practices. Plaintiff, individually and on behalf of the class of individuals preliminarily defined below, brings claims for UMB's breach of contract, including the duty of good faith and fair dealing.

1

## PARTIES

4.     Plaintiff Maureen Eichman is a natural person and resident of Overland Park, Johnson County, Kansas. Plaintiff is thus a citizen of the State of Kansas.

5.     Plaintiff has had a checking account with UMB at all times material hereto.

6.     UMB is a national bank that maintains its principal place of business in Kansas City, Jackson County, Missouri. UMB is thus a citizen of the State of Missouri.

7.     UMB has over $33 billion in assets and provides banking services to customers through more than 90 branches in eight states, including Missouri.

8.     Among other things, UMB is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative class.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate sum of the claims of the members of the putative Class exceeds $5 million, exclusive of interest and costs, because Plaintiff brings this action on behalf of a proposed Class that is comprised of over one hundred members, and because Plaintiff and at least one of the members of the proposed Class are citizens of a different state than UMB.

10.     This Court has personal jurisdiction over UMB because UMB conducted business in and throughout the Western District of Missouri at all times material hereto.

11.     UMB regularly and systematically conducts business and provides retail banking services in this state and provides retail banking services to customers in this state, including Plaintiff and members of the putative Class. As such, it is subject to the jurisdiction of this Court.

2

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District. Venue is further proper pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to personal jurisdiction in this District.

## BACKGROUND FACTS

13.     OD Fees and insufficient funds fees are among the primary fee generators for banks. According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees. *Overdraft Revenue Inches Up in 2018*, Moebs (Mar. 27, 2019), https://bit.ly/3cbHNKV.

14.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees. *Overdrawn: Consumer Experiences with Overdraft*, Pew Charitable Trusts 8 (June 2014), https://bit.ly/3ksKD0I.

15.     Through the imposition of these fees, UMB has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I.     UMB ASSESSES OD FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS

### A.  Overview of the Claim

16.     Plaintiff brings this action challenging UMB's practice of charging OD Fees on what are referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

17.     Here's how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, UMB immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking

account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because UMB has already held the funds for payment.

18.     However, UMB still assesses crippling $36 OD Fees on many of these transactions and misrepresents its practices in the Contract.

19.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, UMB later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

20.     UMB maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, UMB holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

21.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

4

22. That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

23. Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, UMB improperly charges OD Fees on APSN Transactions.

24. The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits

5

to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

25. There is no justification for these practices other than to maximize UMB's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But UMB is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

26. But UMB was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

27. Besides being deceptive, these practices breach contract promises made in UMB's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of UMB's processes and practices. UMB also exploits its contractual discretion by implementing these practices to gouge its customers.

**B. Mechanics of a Debit Card Transaction**

28. A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from UMB. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to UMB, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

29. At this step, if the transaction is approved, UMB immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

6

30.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

31.     UMB (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that UMB may choose either to pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033, 59046 (Nov. 17, 2009).

32.     There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

**C. UMB's Contract**

33.     Plaintiff has a UMB checking account, which is currently governed by the Account Agreement. Ex A.

34.     The Account Agreement defines "overdraft" as "any negative balance in your account resulting from the posting of any item or other debit to your account." Ex. A at 3.

35.     The Account Agreement promises that "if your available balance is not sufficient to cover all of the items that are posted to your account on any business day, then we will assess and debit insufficient funds or overdraft charges to your account." *Id.* at 8.

36. In breach of this promise, UMB assesses OD Fees on transactions for which the customer's "available balance" is "sufficient" "to cover all of the items that are posted" to an account.

37. The "available balance" is defined as UMB's "most current record of the funds in your account that are available for withdrawal. Funds in your account that are subject to a deposit hold, dispute, legal process, or a pending transaction are not available." *Id.* at 3.

38. UMB promises that "debit card transactions . . . and other pending transactions will reduce [the] available balance during the day." *Id.* at 6.

39. The Account Agreement reiterates this promise to reduce the available balance to reflect pending debit card transactions, explaining:

> When we receive an authorization required from a merchant or other party from which a purchase is being made with your debit card, we have the right to place a temporary hold – known as an **"authorization hold"** – against some or all of the funds in your account. If we place an authorization hold against your account, the amount of such authorization hold will decrease your available balance.
>
> . . .
>
> We have the right to maintain an authorization hold against your account until we receive the purchase transaction that matches the authorization hold.

*Id.* at 6 (emphasis in original).

40. These held funds are specifically reserved to "cover" the transaction for which they are held and "are not available" to "cover" other transactions. *See id.* at 3.

41. Because these held funds remain held in the account "until [UMB] receive[s] the purchase transaction that matches the authorization hold," a debit card transaction that is authorized on sufficient available funds cannot overdraw the account at posting.

42. The Account Agreement further promises: "If your available balance is not sufficient to cover any item presented to us for payment, the item will be posted provisionally to

8

your account pending our decision to return or to pay the item. . . . We may assess and debit a service charge against your account for an item returned for insufficient funds or for an overdraft." *Id.* at 10.

43.    UMB's "decision to return or to pay" a debit card transaction necessarily occurs at the moment of authorization. Once a transaction is authorized, UMB has no discretion to return the transaction and "must pay" it when the merchant presents it for settlement. 74 Fed. Reg. at 59046.

44.    The Account Agreement further promises that, for accountholders who "do not use an Overdraft Protection Service," transactions are "presented to [UMB] for payment" and overdrafts are determined at authorization:

> If you do not use an Overdraft Protection Service, then the actions that we are authorized to take in connection with *an item presented to us for payment from your account and that would create an overdraft* in your account if paid will depend upon the type of item, and those actions are as follows:
>
> – ATM and "One-Time" Debit Card Transactions. We generally will not authorize an ATM withdrawal from your account if your available balance shows that allowing the withdrawal would create an overdraft. *We also generally will not authorize a "one-time" debit card transaction (also known as an "everyday" debit card transaction) against your account if your available balance shows that allowing the payment would create an overdraft*, unless you have requested that we pay those transactions as overdrafts through our Debit Card Overdraft Authorization and Enrollment.

Ex. A at 10 (bolding omitted, italics added). Nothing in the contract suggests that items are "presented for payment" at a different time for consumers who *do* "use an Overdraft Protection Service." *See generally id.*

45.    To the contrary, the Account Agreement expressly warns consumers that "[i]t is your responsibility to know if there are sufficient funds in your account before you write a check,

9

make a cash withdrawal at an ATM, *make a purchase with your debit card, or issue, initiate or authorize any other item for payment from your account*." *Id.* at 10 (emphasis added).

46.    Taken together, these promises mean that transactions are "covered" and "presented to [UMB] for payment"—and therefore overdrafts are determined—when UMB authorizes the debit card transaction because this is when UMB makes the "decision to return or to pay" a debit card transaction.

47.    For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to "cover" those transactions at the time they are "presented to [UMB] for payment"—yet UMB assesses OD Fees on them anyway.

48.    The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative available balance. Of course, that is not true for APSN Transactions.

49.    UMB actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, UMB uses a secret posting process described below.

50.    All of the above representations and contractual promises are untrue. UMB charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that UMB may impose fees on any APSN Transactions.

51.    The contract also misconstrues UMB's true debit card processing and overdraft practices.

52.     First, and most fundamentally, UMB charges OD Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

53.     UMB's practice of charging OD Fees even when the available balance is sufficient to cover a transaction violates its contractual promise not to do so. This discrepancy between UMB's actual practice and the Contract causes consumers like Plaintiff to incur more OD Fees than they should.

54.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

55.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what UMB does when it re-debits the account during a secret batch posting process.

56.     UMB's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

57.     At the time of settlement, however, an available balance does not change at all for transactions previously authorized into positive funds. As such, UMB cannot then charge an OD Fee on those transactions because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

58.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, UMB releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

11

59.     This secret step allows UMB to charge OD Fees on transactions that never should have been charged OD Fees—transactions that were authorized into sufficient funds, and for which UMB specifically set aside money to pay.

60.     In sum, there is a huge gap between UMB's practices as described in the contract and UMB's actual practices.

61.     Banks and credit unions like UMB that employ this abusive practice require their accountholders to expressly agree to it—something UMB here never did.

62.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

63.     For example, Bank of America's deposit agreement states:

> Debit card transactions and related authorization holds may impact your available balance. It is important to know that your available funds may change between the time you authorize a transaction and when the transaction is paid. . . . **The amount being held is not applied to the debit card transaction**. . . . **If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant**. . . .

> Here is an example of how that may happen: On Monday we authorize a debit card transaction because you have enough available funds at the time. A hold is then placed on your funds until the merchant presents the transaction for payment. On Tuesday we process and post another transaction (such as a check you wrote) that reduces your available funds below zero. If the merchant presents the original debit card transaction for payment on Wednesday, and your available funds are now below the amount needed to pay the transactions, the debit card transaction will overdraw your account and you may incur an overdraft fee.

*Deposit Agreement and Disclosure*, Bank of America 18 (Feb. 19, 2021), https://bit.ly/38iRk1G

(emphasis added).

64.     UMB and its accountholders make no such agreement. The Contract thus misleads and deceives account holders.

### D.  Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

65.     UMB's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

66.     UMB was and is aware that this is precisely how its accountholders reasonably understand debit card transactions to work.

67.     UMB knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards, as the money comes directly out of the checking account.

68.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

69.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their

wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

70.    Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

71.    Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How Overdraft Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

72.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



**Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints**

*Id.*

14

73.     Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

74.     Ultimately, unclear and misleading fee representations like those in UMB's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

75.     The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

76.     Despite this recommendation, UMB continues to assess OD Fees on transactions that are authorized on sufficient funds.

77.     UMB was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time the transactions are actually initiated—and the contract only supports this perception.

78.     UMB was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

**E. Plaintiff Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds**

79.     On February 1, 2017, Plaintiff was assessed a $36 OD Fee on a $2.67 debit card transaction to USPS Kiosk 198 that settled on January 31, 2017 even though this transaction had

15

been authorized on sufficient funds, sufficient funds to "cover" the transaction were placed on hold at that time, and the funds remained held in the account at the time the transaction posted.

80.     On February 1, 2017, Plaintiff was assessed another $36 OD Fee on a $13.20 debit card transaction to USPS Kiosk 198 that settled on January 31, 2017 even though this transaction had been authorized on sufficient funds, sufficient funds to "cover" the transaction were placed on hold at that time, and the funds remained held in the account at the time the transaction posted.

81.     In total, UMB assessed Plaintiff $72 in improper OD fees in a single day.

82.     The improper fees charged by UMB were not "errors" by UMB, but rather were intentional charges made by UMB as part of its standard processing of transactions.

83.     Plaintiff therefore had no duty to report the fees as "errors" because they were not "errors," but were part of the systematic and intentional assessment of fees according to UMB's standard practices.

84.     Moreover, any such reporting would have been futile as UMB intentionally decided to charge the fees in this manner.

**F.  The Imposition of these Improper Fees Breaches UMB's Duty of Good Faith and Fair Dealing**

85.     Parties to a contract are required not only to adhere to the express terms of the contract but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

16

86.     Here—in the adhesion agreements UMB foisted on Plaintiff and its other customers—UMB has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, UMB abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged OD Fees on debit card transactions authorized on sufficient funds.

87.     UMB exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. UMB also abuses the power it has over customers and their accounts and acts contrary to their reasonable expectations under the Contract. This is a breach of UMB's implied covenant to engage in fair dealing and to act in good faith.

88.     Further, UMB maintains complete discretion not to assess fees at all. Instead, UMB always charges these fees. By always exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers, UMB breaches the reasonable expectations of Plaintiff and other customers and, in doing so, violates its duty to act in good faith.

89.     It was bad faith and fully outside Plaintiff's reasonable expectations for UMB to use its discretion in this way.

90.     When UMB charges improper fees in this way, UMB uses its discretion to define the meaning of key terms such as "enough money," "honor," "cover," "presented," and "pay" in an unreasonable way that violates common sense and reasonable consumers' expectations. UMB uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more OD Fees.

17

## CLASS ALLEGATIONS

91.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a).

92.     Plaintiff brings this action individually and as a class action on behalf of herself and the following proposed Class:

> All individuals who, during the applicable statute of limitations, were UMB Bank checking account holders and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized and before the authorization hold expired.

Plaintiff reserves the right to modify or amend the definition of the Class as this litigation proceeds.

93.     Excluded from the Class are UMB, its parents, subsidiaries, affiliates, officers and directors, any entity in which UMB has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

94.     Upon information and belief, the Class consists of thousands of members, such that joinder of all Class members is impracticable.

95.     There are questions of law and fact that are common to all members of the Class that relate to UMB's practice of charging improper OD Fees.

96.     The claims of Plaintiff are typical of the claims of the proposed Class because they are based on the same legal theories and Plaintiff has no interests that are antagonistic to the interests of the members of the Class.

18

97.     Plaintiff is an adequate representative of the Class and has retained competent legal counsel experienced in class actions and complex litigation, including litigation against financial institutions.

98.     The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, particularly because the focus of the litigation will be on UMB's conduct. The predominant questions of law and fact in this litigation include, but are not limited to, whether UMB:

- Imposed OD Fees on debit transactions that were authorized on sufficient funds and that settled on negative funds in the same amount for which the transaction was authorized before the authorization hold expired;

- Breached its contract with Plaintiff and members of the Class;

- Breached the covenant of good faith and fair dealing imposed on it; and

- Violated the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.010 *et seq.*

99.     Other questions of law and fact common to the Class include the proper method or methods by which to measure damages.

100.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of hundreds of individual lawsuits would not be economically feasible for individual members of the Class, and certification as a class action will preserve judicial resources by allowing the common issues of the members of the Class to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of UMB, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses

and UMB's misconduct will proceed without remedy. In addition, without a class action, it is likely that many members of the Class will remain unaware of UMB's conduct and the claims they may possess.

101.    It appears that other persons who fall within the definition of the Class set forth above are not pursuing similar litigation, such that individual Class members do not wish to control the prosecution of separate actions.

102.    This proposed class action does not present any unique management difficulties.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract including Breach of the Covenant of Good Faith and Fair Dealing**
(***On behalf of Plaintiff and the Class***)

103.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

104.    Plaintiff and UMB have contracted for bank account deposit, checking, and debit card services. *See* Ex. A.

105.    Similarly, all members of the Class have contracted with UMB for bank account deposit, checking, and debit card services. *See id.*

106.    All of UMB's account holders, including Plaintiff and the members of the Class, are subject to UMB's account documents.

107.    UMB misconstrued in its account documents its true OD Fee practices and breached the express terms of the contract.

108.    No contract provision authorizes UMB to charge OD Fees on debit card transactions authorized on sufficient funds.

109.    UMB breached the terms of its contract by charging OD Fees on debit card transactions authorized on sufficient funds.

20

110.     Under Missouri law, good faith is an element of every contract. Good faith is also mandated by the Uniform Commercial Code ("UCC"), which covers banking transactions. Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

111.     UMB abuses its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging OD Fees on debit card transactions authorized on sufficient funds. This is an abuse of the power that UMB has over Plaintiff and her bank account, is contrary to Plaintiff's reasonable expectations under the Contract, and breaches UMB's implied covenant to engage in fair dealing and to act in good faith.

112.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

113.     UMB has breached the covenant of good faith and fair dealing in the contract through its policies and practices as alleged herein.

114.     Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

115.    Plaintiff and members of the Class have sustained damages because of UMB's breach of the Contract.

116.    Plaintiff and members of the Class have sustained damages because of UMB's breach of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Violation of the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.010 *et seq.***
**(*On behalf of Plaintiff and the Class*)**

117.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

118.    The Missouri Merchandising Practices Act ("MMPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practices or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."

119.    Such acts are prohibited whether committed before, during or after the sale, advertisement or solicitation in question.

120.    Plaintiff is a "person" for purposes of the Merchandising Practices Act ("MPA"). R.S.Mo. §407.010, et seq.

121.    UMB is likewise a "person" as defined in the MMPA because it is a for-profit corporation.

122.    UMB engages in "commerce" as defined in the MMPA because it offers services that directly or indirectly affect the people of Missouri.

123.    UMB is a nationally chartered bank and is thus not exempted by any provision of the MMPA.

22

124. The services and/or product acquired from UMB are "merchandise" for purposes of the MPA.

125. Plaintiff purchased the merchandise from UMB for personal, family or household purposes.

126. Plaintiffs paid for such merchandise.

127. UMB committed engaged in deceptive acts, such as deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, and/or omission of material facts to Plaintiff. Such deceptive acts, include but are not limited to:

    a. Representing that its account deposit, checking, ATM, and debit card services had performance, characteristics, uses, or benefits they did not have which UMB knew or should reasonably have known they do not have; and

    b. Representing that its account deposit, checking, ATM, and debit card services were of a particular standard, quality, grade, style, or model, when they were not and when UMB knew or should have reasonably known that they were not.

128. As alleged herein, UMB also engaged in a scheme to assess improper overdraft fees and in doing so committed acts in violation of the MMPA including assessing overdraft fees under false pretenses, making false promises regarding its assessment of overdraft fees, misrepresenting its true overdraft practices to its customers, and unfairly concealing its true overdraft practices to its customers.

129. The MMPA provides that "[a]ny person who purchases or leases merchandise for personal, family, or household purposes and thereby suffers and ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action . . . to recover

23

actual damages. The court may, at its discretion, award punitive damages and may award to the prevailing party attorney's fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary and proper." Mo. Ann. Stat § 407.025(1).

130. The MMPA further provides that "[a]n action may be maintained as a class action in a manner consistent with Rule 23 of the Federal Rules of Civil Procedure and Missouri rule of civil procedure 52.08 to the extent such state rule is not inconsistent with the federal rule . . . . As alleged herein, this action meets all of the requirements of Rule 23 of the Federal rules of Civil Procedure and also fulfills the requirements of Mo. Ann. Stat. § 407.025((3)(1 – 7).

131. Had Plaintiff and members of the Class been aware that deposited funds would be improperly held and that they were going to be charged Overdraft Fees in the manner UMB assessed them, Plaintiff and members of the Class would not have entered into such transactions.

132. As a direct and proximate result of UMB's deceptive acts and practices in violation of the MMPA, Plaintiff and members of the Class have incurred more Overdraft Fees then they should have suffered monetary damages for which UMB is liable.

133. Plaintiff and members of the Class seek actual damages, interest on damages at the legal rate, as well as all other just and proper relief afforded by the MMPA. As redress for UMB's repeated and ongoing violations, Plaintiff and members of the Class are entitled to, inter alia, actual damages, punitive damages, attorney's fees, and injunctive relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff and members of the Class demand a jury trial on all claims so triable and judgment as follows:

a.      Certification for this matter to proceed as a class action under Rule 23(a);

24

b.   Designation of Plaintiff as Class Representative, and designation of the undersigned as Class Counsel;

c.   Restitution of all improper fees paid to UMB by Plaintiff and the Class, because of the wrongs alleged herein in an amount to be determined at trial;

d.   Actual damages in an amount according to proof;

e.   Pre- and post-judgment interest at the maximum rate permitted by applicable law;

f.   Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

g.   Attorneys' fees under the MMPA, the common fund doctrine and all other applicable law;

h.   Punitive damages under the MMPA;

i.   Injunctive and declaratory relief prohibiting UMB from engaging in the practices outlined herein and declaring such practices unlawful; and

j.   Such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.

Dated: May 20, 2021

/s/ Daniel A. Thomas
Daniel A. Thomas          #52030
Humphrey Farrington & McClain P.C.
221 West Lexington Avenue
Independence, MO 64050
Phone: (816) 398-7435
dat@hfmlegal.com

Lynn A. Toops*
COHEN AND MALAD, LLP

25

One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch, IV*
Martin F. Schubert*
BRANSTETTER, STRANCH
& JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@bsjfirm.com
martys@bsjfirm.com

Christopher D. Jennings*
JOHNSON FIRM
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Phone: 501-372-1300
Fax: 888-505-0909
chris@yourattorney.com

* To seek admission *pro hac vice*

**Counsel for Plaintiff and the Proposed Plaintiff Class**